# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1885.

### [No. 2107.]

### DAVE LILLY *v.* THE STATE.

1. MURDER — EVIDENCE.— A State's witness in a trial for murder testified that, after the fatal blow was struck, and just after the deceased fell, he, the witness, picked up a pistol from the ground near the feet of the deceased; that he did not know to which of the parties it belonged, but, supposing it to belong to the deceased, he put it in the wagon amongst his other things. The defense proved the defendant's declarations, made a few minutes after he struck the blow, to the effect that just before he seized the weapon with which he struck the blow, he saw the deceased thrust his hand behind him, as he thought, to draw a knife. He then offered a witness by whom he proposed to prove that, a very short time after the difficulty, he requested the witness to go to a neighbor's house for the purpose of summoning a doctor; that the witness put on and wore the coat of the State's witness who had picked up the pistol, and that he found a pistol in the pocket of that coat which he identified as the pistol of the deceased. *Held,* that this evidence was pertinent in view of the other evidence in the case, and tended strongly to corroborate the statement of the defendant as to the action of the deceased with his hand, and its exclusion was error.

2. SAME — CASE APPROVED.— Having proved the declarations of the defendant as to the acts of the deceased at the time the fatal blow was struck, and in the same connection having adduced testimony to the effect that the deceased was a violent, dangerous man, and one likely to execute threats, the defense proposed to prove that the deceased habitually bore arms or carried deadly weapons. *Held,* that the facts in proof brought the evidence within the rule announced in Horbach's case, 43 Texas, 242, and it should have been admitted.

3. SAME — JUSTIFIABLE HOMICIDE IN DEFENSE OF PROPERTY.— By express provision of article 572 of the Penal Code, the right is conferred to take life in the protection of property, provided all other means have been first resorted to in order to prevent the injury, and the circumstances which must concur to justify such homicide are enumerated in article 575 of the Penal Code as follows: "1. The possession must be of corporeal property and not of a mere right, and the possession must be actual and not merely constructive. 2. The possession must be legal, though the right of the property may not be in the possessor. 3. If possession be once lost, it is not lawful to regain it by such means as result in homicide. 4. Every other effort in his power must have been made by the possessor to repel the aggression before he will be justified in killing." See the statement of the case for evidence which demanded of the trial court a charge embodying the law thus declared.

4. SAME — CHARGE OF THE COURT. — See the opinion *in extenso* for a charge of the court *held* erroneous, because its effect was to instruct the jury that the defendant could justify the homicide in defense of his property only by showing that the assault of the deceased upon his property imperiled n~ only his property but his person.   See the opinion, also, for a requeste' struction on the subject which correctly announced the law, but w. neously refused.

5. SAME — SELF-DEFENSE. — Note a state of case to which the court a_r pnes the following rule: If the defendant, at the very time the deceased was making a violent assault upon his property, used the means at his command to effectuate the prevention of the injury, he was justified in using them ; and if, after defeating the assault upon his property, his person was assaulted by the deceased with a deadly weapon, or one likely to produce death or serious bodily injury, he was not bound to retreat, and if it reasonably appeared to him that he was imminently threatened with death or serious bodily harm, he had the right to strike, even to the taking of life, in his own self-defense.   If he was justified in the means he used to prevent the injury or appropriation of his property, the right or wrong of his subsequent acts would depend upon whether he or the deceased was the wrong-doer in producing the occasion for the homicide.   If the defendant, then he would be guilty of whatever degree of offense he may have committed ; but if the deceased was the aggressor in producing the occasion for the homicide, then the defendant would be justifiable.

APPEAL from the District Court of Panola.   Tried below before F. B. Sexton, Esq., Special Judge.

The indictment charged the appellant with the murder of Andy Flake, in Panola county, Texas, on the 20th day of January, 1884. His trial resulted in his conviction for manslaughter, and his punishment was assessed at a term of two years in the penitentiary.

John Solomon, colored, was the first witness for the State.   He testified that, on the morning on which the homicide occurred, he went to the house of Andy Flake, for the purpose of helping Flake move to the Walker place, near Carthage.   While loading the wagon Flake told witness to leave room for a sow and pigs which he was going by defendant's pen to get.   On their way the witness and Flake stopped the wagon about forty yards from the defendant's house.   The defendant, who was cutting wood at some distance from his house, was called to the wagon, when the deceased told him that he had come by to get his hogs.   Defendant replied that he had paid Chick Hooker $3 for getting the hogs up, and that deceased would have to reimburse him that amount before he could get them. Deceased asked in reply:   "Did I give you any authority to put the hogs up?"   Defendant answered that he thought the trade was authority enough.   Deceased then asked the defendant if he had paid anything for the hogs.   He replied that he had not, but had

paid Hooker for getting them up.  Deceased then asked, the second time, if he could get the hogs, and defendant again replied that he could not get them until he paid the $3.  Deceased then proposed to settle the matter by taking the pigs and giving the defendant the sow, or to leave the sow until he could get the money, which proposition the defendant refused.  Witness then produced a five-dollar bill and proposed to pay the $3 and take the sow, if the defendant could change the bill.  Defendant replied that he had no change, and that the deceased could not take the hogs.  Deceased then told defendant that unless he would give up the hogs, he, deceased, would pull down the fence and turn the animals out, and he proceeded to carry this threat into execution by throwing off the rails of the defendant's pen.  He had thrown down two, and was throwing off the third rail, when the defendant sprang into the pen, caught up a board six feet by two and a half in size, and struck the deceased with it.  Deceased then retreated some twenty yards, and the defendant got out of the pen, and told deceased that if he again attempted to pull down the fence he would kill him, at the same time advancing, and striking the deceased two more blows on the head with the board.  Deceased then caught up a hickory stick about seven feet long, and about one and a half inches in diameter. Defendant ran off some distance and procured a pine pole about ten feet long, and two and a half inches in diameter, and came back, and struck at deceased with it.  Deceased struck at defendant twice with his stick, one blow brushing the defendant's bosom.  The defendant then struck the deceased on the right side of the back part of the head, and knocked him down.  Witness remarked: "You have killed him."  Defendant replied: "No, I have not, and I would not have killed him for a thousand dollars."  Defendant then called for water with which to bathe the deceased's head, stooped down and wiped deceased's face, and then had the deceased taken to his house, where he died a few hours later.

The witness found a pistol on the ground between the points occupied by the defendant and the deceased, and put it in the wagon with the other things belonging to the deceased.  Witness had never seen that pistol before.  He had never seen it in the hands of the deceased, either at the time of or before the difficulty.  The pistol did not belong to the witness.  Witness testified before the coroner's inquest that he thought the pistol belonged to the deceased. Witness did not first deny seeing the pistol and then testify in regard to it only when admonished repeatedly by the coroner to do so.  No one was present at the difficulty save the witness and the

two participants.   While at the hog-pen, the defendant told the deceased that he thought he (defendant) had bought the hogs. Deceased replied: "Yes, but all of the hogs were not mine; half of them belong to my sister, and she objects to my selling them." When the defendant struck the deceased, the pole broke about the middle.   The instrument used by the deceased was a tough oak stick.   Witness was friendly towards the defendant at the time of the difficulty, and was then waiting upon the deceased's sister. Witness's testimony before the coroner's inquest was reduced to writing, in the officer's own language, read over to and signed by the witness.   After the deceased fell witness felt of the wound on his head.   The place was soft and "musby."   The State closed.

· The defense first introduced the entire record of the proceedings before the coroner's inquest.   Doctor J. W. Burns, a witness sworn before that tribunal, testified that he was called to examine the dead body of Andy Flake, and found that death resulted from a blow on the back part of the head inflicted with a blunt instrument, which blow produced both concussion and compression of the brain, either of which was sufficient to produce death.   Flake had died before the witness arrived.

· John Solomon's testimony before the coroner's inquest, as shown by the record, was substantially as follows: He, witness, started with Flake to Walker's place near Carthage, having Flake's goods in a wagon.   They stopped near the defendant's house, and went to the defendant's hog-pen, where the defendant was at work.   Flake wanted to get a sow and pig which the defendant had taken up for him, and for which he was indebted to the defendant in the sum of $3, which he proposed to pay during the following week.   Defendant objected to Flake's moving or taking possession of the animals until the money was paid.   Flake then began to tear down the defendant's pen, saying that he would have the pig or turn both animals out.   He proposed at the same time to leave the sow to defendant, if defendant would surrender the pig.   Defendant replied that Flake should have neither animal until he paid the $3.   When Flake commenced to pull down the fence, defendant jumped into the pen, seized a board and struck at but missed Flake.   Flake, followed by defendant, stepped back about ten steps, when defendant, striking him twice over the head with the board, told him that he would kill him if he further attempted to pull down his fence.   Flake then passed behind witness and caught up a tough oak stick, about seven feet long and one inch in diameter.   Defendant, at about the same time, secured a dead pine pole, about ten feet long and about two

and a half inches in diameter at the butt, and an inch at the point, with which, having advanced upon Flake, he struck at and missed Flake. Flake then struck at and missed defendant, and struck a second blow which brushed the defendant's bosom. Defendant then struck Flake behind the right ear with the pole, knocking him down, speechless and apparently dead. After Flake fell, the witness picked up a pistol from the ground, about one yard from Flake's feet. Witness did not know to which of the parties the pistol belonged, but, supposing it to belong to Flake, he put it in the wagon with his other things. Witness remarked to defendant that he had killed Flake. Defendant replied: "I reckon not," and called one of his children to bring him some water. Defendant and Flake's sister then turned Flake over, and the defendant wiped Flake's mouth. About this time Flake began to breathe, and his sister remarked that she wished her brother was at home, and off the cold ground. Defendant replied that, if agreeable, he would have him taken to his house. Flake was accordingly removed to the defendant's house, and placed in a bed, where he expired between 7 and 8 o'clock on that night. The difficulty occurred about half-past 11 o'clock in the morning.

D. J. Woods was next introduced as a witness for the defense. He testified that at the time of Flake's death, he, Flake, was a tenant of his, and occupied a house about four hundred yards from the house occupied by witness. The fatal blow was struck near the house and on the premises occupied by the defendant, which was on the witness's place. Witness did not see the killing, but was at the pen about an hour afterwards. He then and there saw an oak stick about one and a half inches across the butt, and an inch at the point, and about seven feet in length. It was a hard, well-seasoned, sound oak stick, and would weigh some two or three pounds. He saw also an unsound pine stick, about ten feet long and two and a half inches across the butt. Either of the sticks could be so used as to produce death. The defendant was a man over fifty years of age, and was regarded as a peaceable, law-abiding man. The deceased was about twenty-one years old, was six feet and one inch in height, was very strong, and weighed about one hundred and eighty pounds. His reputation was that of a turbulent, violent and overbearing man. Witness knew that the reputation of the State's witness Solomon for truth and veracity was very bad in the neighborhood in which he lived.

The witness was present and heard the testimony of the State's witness Solomon before the coroner's inquest. When before that

tribunal, he at first denied that he saw a pistol at the time of the difficulty, but after he was several times admonished by the coroner that he had best tell the truth, he admitted that he picked up a pistol from the ground just after Flake fell, and put it in the wagon with the other of Flake's goods. The defendant came to the witness's house shortly after the difficulty, and told the witness that he had struck the deceased and feared that he had killed him. He said to witness that the deceased came to his house and proceeded to tear down his hog-pen, when he got into the pen, took up a board and struck the deceased; that the deceased then retreated, secured a pole and advanced upon him, and that he also advanced, having secured a pole, and that both struck with their poles, both missing; that they each struck again, both hitting, but that he did not know that his blow took effect until the deceased fell. Defendant then exhibited an impression on his head which appeared to have been made with a stick. Defendant at no time told the witness, in the presence of Sam Davis, that he killed deceased because the deceased threw his hand behind him and led him to believe that he was going to draw a knife. He gave witness no other reason for what he did than that deceased tried to pull down his hog-pen. When the witness first saw the deceased lying dead, he lay about twenty or thirty feet from the defendant's hog-pen. The pen was between the body and the defendant's house. The poles described by the witness lay on the ground near the body. The declarations of the defendant, as stated by the witness, were called out by the State upon cross-examination.

Mrs. Eliza Lilly, the defendant's wife, testified in his behalf that she was in bed sick, and did not see the difficulty. The deceased died in the house occupied by the witness and the defendant. A few days before the difficulty, the deceased came to defendant's house to get a mule to ride to Carthage, for which he agreed to pay the defendant $1. Not having the dollar, he told the defendant that it could be applied to the purchase of the hogs, and defendant agreed for it to be so applied. The hogs spoken of were those which were in the pen at the time of the difficulty. Defendant and witness went to Hooker's after the hogs, and defendant helped Hooker slaughter his, Hooker's, hogs to pay Hooker for getting up his, defendant's, hogs. Defendant did not own a pistol.

. Sam Davis testified, for the defense, that he reached the defendant's house some ten or fifteen minutes after the difficulty. Witness borrowed from Solomon the coat which he, Solomon, was then wearing, to take his mother home. When witness reached the de-

fendant's house, defendant had a cup in his hand. Deceased was lying down. Defendant told witness that deceased attempted to destroy his hog-pen, when he struck him with a board; that the deceased then got a pole, and that he got another; that they struck at and missed each other; struck again and knocked each other down; that when the deceased ran to and secured the stick, he, deceased, threw his hand behind him, and he thought deceased was getting a knife. He also told witness that he saw Solomon pick up a pistol after deceased fell. Mr. Dave Wilson was present.

Several witnesses for the defense testified that whereas the reputation of the defendant for peace and order, and as a quiet, law-abiding man, was good, that of the deceased was that he was an exceedingly turbulent, violent and overbearing man. They testified also that Solomon's reputation for truth and veracity in the community in which he lived was so bad that he was not entitled to credit, upon oath. Other matters appear in the opinion.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appellant was convicted of manslaughter, upon an indictment charging him with the murder of one Andy Flake.

Appellant and deceased had made a trade for some hogs. Appellant paid a party by the name of Hooker $3 to get up the hogs for him, and had also hired a mule to deceased for a dollar, which was to go in part payment of the hogs. After they were gotten up, the hogs were put into a pen at appellant's home. On the day of the homicide deceased and one Solomon went with a wagon to appellant's house to get the hogs, deceased telling appellant that his, deceased's, sister owned an interest in the hogs which she refused to sell. Appellant refused to let him have them until he had repaid him what he had paid on them. This the deceased was unable to do, and defendant refused positively to let him have them. Deceased said he would take them anyhow; went to the pen and commenced tearing it down, when defendant, saying if he attempted to turn them out he would kill him, seized a board off the pen and struck him one or more licks with it. Deceased retreated some distance, about twenty-five or thirty feet, and picked up a tough oak stick

about seven feet long, and proven to be a deadly weapon. Both parties advanced, and defendant seized a pine pole about eight or ten feet long, and when in reach of each other, after one or two attempts to strike were made by both parties, which missed, they both struck each other, both being knocked down, and deceased having received the fatal injury from which he died after several hours.

Declarations made by defendant within ten or fifteen minutes of the difficulty, as to how it occurred, were admitted in evidence, and from these it appeared that before or about the time he seized the pine pole, he saw deceased throw his hand behind him, as he thought, to draw a knife. After the difficulty a pistol was picked up by the witness Solomon close to where deceased was lying, but between his body and the pen. The reputations of both defendant and deceased for violence and peaceableness were put in evidence, and it appears that whilst defendant, who was a man over fifty years of. age, had the reputation of being a peaceable, quiet, law-abiding man, the deceased, who was a young, stout, able-bodied man, was regarded as violent, dangerous and overbearing.

Besides the actors in the tragedy, Solomon was the only eye-witness present. On the examining trial had before a justice of the peace, it was with some reluctance that the witness testified to his having picked up a pistol at the place just after the difficulty. On this trial he testified that, "after Flake fell, he picked up a pistol about three feet from Flake's feet, as he lay on the ground, but does not know to which of the parties it belonged; but supposed it was Flake's, and put it in the wagon amongst his other things."

Defendant proposed to prove by his witness Sam Davis that he was at Lilly's house a very short time after the difficulty, and that witness was requested to go to a neighbor's house to get him to go after a doctor; that witness put on and wore the State's witness Solomon's coat, and that he found in a pocket of said coat a pistol belonging to the deceased. Upon objection this testimony was refused by the court. We are of opinion that under the circumstances shown this ruling was erroneous.

The evidence was pertinent. Solomon had testified he did not know to whom the pistol belonged which he had picked up; it was proposed to show by this witness that it belonged to deceased. Defendant had stated that before he advanced and seized the pole he saw deceased throw his hand behind him, as he supposed, to draw a knife. If, instead of a knife, deceased attempted to draw, or did draw, a pistol, it would nevertheless have strongly tended to

corroborate the statement of defendant that he threw his hand behind him as if to draw a deadly weapon.

Again, it was proposed by defendant to prove that deceased was a man who habitually bore arms or carried deadly weapons. This testimony was also disallowed on objection. Taken in connection with his character as that of a dangerous, violent, overbearing man, and the fact that he was seen to throw his hand behind him just before or about the time defendant seized the pole and struck with it, the case comes directly within the rule declared in Horbach's case, 43 Texas, 242, wherein "defendant, by counsel, sought to prove by questions to the witnesses that Thomas was in the habit of carrying deadly weapons, and that Thomas, when intoxicated, was a quarrelsome and dangerous man." The court held that it was error to refuse to allow the questions to be answered, and that the testimony was admissible.

In *Williams* v. *The State*, 13 Texas Ct. App., 102, this court said a defendant " is entitled to prove, in explanation, extenuation or justification of his acts, the general character of the deceased as being that of a violent and dangerous man, or his general character in any other respect which would tend to determine the grade of the homicide by showing the intent actuating the defendant in its commission." (See, also, 2 Bish. Crim. Proceed., § 610; *Moore* v. *The State*, 15 Texas Ct. App., 1; *West* v. *The State*, 18 Texas Ct. App., 640; Whart. on Homicide, § 606.)

Homicide is only justifiable in the protection of property after all other means have been resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful or violent attack; and such homicide, to be justifiable, must be committed under the following circumstances, viz.:

" 1. The possession must be of corporeal property, and not of a mere right, and the possession must be actual, and not merely constructive.

" 2. The possession must be legal, though the right of the property may not be in the possessor.

" 3. If possession be once lost, it is not lawful to regain it by such means as result in homicide.

" 4. Every other effort in his power must have been made by the possessor to repel the aggression before he will be justified in killing." (Penal Code, arts. 572, 575.)

It is a general rule that the owner of personal property has a right to use as much force as is necessary to prevent its forcible, illegal removal. (Whart. on Homicide (2d ed.), § 540.) But, says Mr.

Bishop, " a man commits a felonious homicide who inflicts death in opposing an unlawful endeavor to carry away his property. There is here the right to resist, but not to the taking of life." (1 Bish. Crim. L. (7th ed.), § 876.) This is not the rule in this State, or, rather, our statute above quoted presents the exceptions to the rule, and under those exceptions the right, even to the taking of life in defense of the forcible taking or removal of one's property, is not only recognized but justified.

Article 572 of our Code, *supra*, expressly gives the right to take life in the protection of property, provided all other means have been resorted to for the prevention of the injury, and article 575, which we have quoted, enumerates the circumstances which must concur in order to make the homicide justifiable. The facts in the case made it essential that the court should have charged the jury the law as declared by these statutes, and special instructions were asked by defendant embodying in terms the language of the statute, which the court refused to give.

One of the instructions given by the learned judge to the jury in his application of the law to the facts is in these words, viz.:

"If you believe from the evidence before you that the defendant killed the deceased, and that at the time of the said killing the deceased was in the very act of making a violent attack on the person or property of the defendant, *and that by reason of such violent attack on the person or property of defendant the life of said defendant was put in peril,*—that is to say, if the said violent attack of the deceased (if any was made) on the person or property of the defendant *was such that the said defendant could not* preserve his *own life from destruction in any other manner or by the use* of any other means (except by retreating, which the defendant was not required to do) than by slaying the deceased; or if the said violent attack of the deceased (if any were made) on the person or property of the defendant, which, as you have already been told, must have been made at the time of the killing, was of such a nature as to produce in the mind of defendant *a reasonable expectation or fear of death or some serious bodily injury then about to be inflicted by the deceased by said violent attack on defendant,* and if you further believe *that said violent attack* of the deceased was not provoked by the defendant, as previously or as may hereafter be explained, and that under these circumstances and conditions the defendant killed the deceased, then you should find the defendant not guilty." We have italicised portions of this instruction with a view of directing special attention to them.

It evidently appears from this charge that, in the opinion of the

learned judge, no homicide in mere defense of property can be justifiable unless the assault or violence upon the property is at the same time accompanied with direct personal violence upon the owner,— in other words, that such violence must be joint, that is, against both property *and* person at the same time. Manifestly this is a misconstruction of the statute with regard to the rights of a defendant who is acting alone or personally in defense of his property. His right to defend property is not dependent upon the fact that the injury to it is or is not accompanied by violence to himself. It is only where a third person interferes in behalf of one whose person or property is assailed, that the killing of the aggressor by such third party will not be justifiable "unless the life or the person of the injured party is in peril by reason of such attack upon his property." (P. C., art. 752.) This instruction was nowhere subsequently corrected in the charge given, nor was any other instruction given with regard to the right of a defendant to kill in defense of property. As stated above, a special requested instruction, embodying in terms our statutes, articles 572, 575, asked by defendant, was refused by the court.

Another instruction asked by defendant and refused was in these words, viz.:

"If deceased attempted to take defendant's hog or hogs in the legal possession of defendant, and while attempting to do so defendant struck him with a board, not being able to prevent him from doing so otherwise, and having resorted to all other means at command to prevent the taking of the hogs, and deceased then and there, after retreating, returned and advanced upon defendant, making motions as if to draw a knife or pistol, and the acts of the deceased in this connection reasonably indicated to defendant that deceased intended to kill or inflict serious bodily harm upon him, and, while so advancing upon defendant, defendant struck him with a stick and killed him, he should be acquitted upon the ground of self-defense." This instruction the appellant was entitled to under the facts as proven, and it was error to refuse it.

The questions involved in the case were: Was the killing in defense of property? If so, was the possession such as is required by the statute, and was every other effort made by the possessor to repel the aggression before the killing? (Penal Code, art. 575.) Inasmuch as defendant did use, first, reason, then threats, and lastly the board when deceased was in the very act of tearing down the pen, if the jury should conclude that such means were reasonable, proper, necessary, and the only means at the command of the de-

fendant at the time, and that they effected the object in driving the deceased from the pen, then defendant up to that time would be justifiable and guiltless of any offense.  And if, after having thus been driven off, deceased, being armed or having armed himself, turned and with a deadly weapon, or one likely to produce death or serious bodily harm, advanced on defendant to wreak his vengeance upon him, defendant was not bound to retreat; and if it reasonably appeared to him that his life was in imminent danger, or that he was in danger of serious bodily harm, he had the right to strike in his own defense, and under such circumstances he would be justifiable upon the ground of self-defense.  If defendant was justifiable in the means he used to drive deceased from tearing down his pen and taking his hogs, then his subsequent acts would depend upon whether or not he or the deceased was the wrong-doer in occasioning the homicide.  If defendant, then he was guilty of whatever degree of offense he may have committed; if deceased, then defendant was justifiable.

For the several errors pointed out above and discussed, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 9, 1885.]